# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.

| | |
|---|---|
| KEVIN MCGEE<br><br>        Plaintiff,<br><br>v.<br><br>JOHN LLEWELLYN<br>ROBERT MANZELLA and<br>STANLEY CLEAVES,<br><br>        Defendants. | **09 CA 11929 JLT**<br><br>MAGISTRATE JUDGE *Collings*<br><br>VERIFIED COMPLAINT |

For his Verified Complaint, Plaintiff Kevin McGee states as follows:

## I. Introduction

This action seeks restitution and equitable relief for violations of the federal RICO statute, plaintiff's civil rights and Massachusetts state law.

The Plaintiff, Mr. Kevin R. McGee, and his business suffered for over 10 years at the hands of the defendants and the criminal enterprise they belong to. Mr. McGee was arrested for concocted charges, numerous times, by a police department led by one of the defendants, at his home and his place of business in the town of Rockland and was stopped, harassed, and threatened by the same defendant and police officers following his orders while moving around town. Mr. McGee was fully acquitted of all charges brought against him in connection with all those arrests by the State District Court and a Massachusetts state court later decided that those arrests have been conducted for "non arrestable offences" and "have been designed to "harass and humiliate" Mr. McGee". Mr. McGee's business in the town of Rockland was shut down and Mr. McGee livelihood and properties were taken from him by the criminal enterprise the three defendants belong to.

In essence, Mr. McGee seeks protection from a corrupt enterprise which targeted Mr. McGee's certain properties because of their proximity to the federally financed development project located at the former South Weymouth Naval Air Station. That development is largest federally financed development projects on the East Coast and the defendants intent is to snatch away those properties from Mr. McGee.

All the three defendants in this case are Rockland Town Officials.

The first defendant is Mr. John Llewellyn, a former chairman of the Town of Rockland board of selectman, a practicing attorney, and the current town of Rockland Chief of Police.

The second defendant is Mr. Robert Manzella, Chairman of the Town of Rockland's Zoning Board of Appeals', a developer and the owner of Manzella industrial Park in Rockland.

The third defendant is Mr. Stanley Cleaves, a member of the Town of Rockland Zoning Board of Appeals.

The three defendants are acting as members and henchmen of a criminal enterprise run by elected officials and businessman.

Other members of the criminal enterprise who supported the defendants effort to jail Mr. McGee and take away his livelihood in order to make it easier to snatch his properties include Mr. Michael Livingstone, a former state judge who was has been removed from the bench for corruption while acting in collaboration with the defendants on behalf of the same criminal enterprise, a former State Senator and head of the Massachusetts Senate Judiciary Commission, Robert S. Creedon, Jr., who had resigned unexpectedly from those positions after events descried in this complaint started to unfold, state senator Mr. Michael W. Morrissey who is involved in managing the criminal enterprise, William "Buzz" Constable, executive vice president of A. W. Perry, Inc., John H. Spurr, Jr., President of A. W. Perry, Inc. and Thomas Teuton, Chairman Of The Boards of A. W. Perry, the owner of Independent Bank Corp. and the Rockland Trust Company bank.

Members of the organization appear to operate with disregards to the laws and with impunity from law enforcement agencies.   If not using methods reminiscent of the Bulger-Connolly era the organization is trying to create the impression it is capable of using the same methods.  While Mr. McGee was conducting his own investigation Mr. McGee was approached by an FBI agent who have shown up in Mr. McGee car business seeking general information about corruption in town. Mr. McGee become suspicious about the agent real motivation and did not share wit the agent inforamtion about his own investigation.  After securing and documenting criminal activities by the defendants Mr. McGee approached the same agent but the agent refuse to investigate or take action and in effect questioned Mr. McGee advising him that he should expect no protection from the FBI. It apears based on subsequent checks with the FBI reveled that the agent had no business visiting Mr. McGee to begin with.

After an arrest of Mr. McGee for concocted charges which have taken place at the beginning of the weekend, Mr. Llewellyn, the Rockland chief of police and the primary  defendant in this case, had admonished a Rockland police officer and order his internal investigation because that officer had contacted a state judge at his home who then ordered Mr. McGee released on bail. That particular arrest was executed at the beginning of a weekend in order to keep Mr. McGee in custody at the Rockland police station for the duration of the weekend. It apears that Mr. Llewellyn through the criminal organization he belong to has arranged in advance with the bondsman that Mr. McGee will not have access to the normal bail procedure. That prompted the police officer in charge to make the telephone call to a state judge at his home. The judge then ordered the release of Mr. McGee on standard bail. On information and belief Mr. Llewellyn's had planed to contrive a violent incident at the police station during the weekend which would have enable Mr. Llewellyn to ensnare Mr. McGee with criminal charges, potentially endangering Mr. McGee's life in order to achieve his goal of jailing Mr. McGee and stopping Mr. McGee investigation of Mr. Llewellyn criminal activities.

Mr. Manzella's and Mr. Llewellyn initial objective appears to have been an effort to extort control of Mr. McGee's certain properties, located on Union street, on behalf of the A. W. Perry Corporation and the Rockland Trust Bank company it owns. The properties were desired by the bank and its owner, the A. W. Perry Company for expansion of their headquarters and the bank's information center located in Rockland.   The two adjacent properties consists together of the largest single undeveloped lot on the town of Rockland main street in walking distance from both the main Rockland entrance to the Weymouth Naval Air Base development site and the Rockland town center where the headquarters of A. W. Perry's Rockland Trust bank holding is located.

When that effort failed Mr. Llewellyn's appeared to have acted in desperation to stop Mr. McGee from investigating Mr. Llewellyn's activities, methods, associates and patrons.    Those activities include Mr. Llewellyn protection of drug activities, his involvement and gain from local Government corruption and embezzlements by employees he appointed and protect, his positioning of criminals in public jobs, his violations of ethics and hiring rules and his harassment of citizens and police officers.

Mr. Cleaves collaborated with the other defendant's in his capacity as a member of the Rockland Zoning Board of Appeals.

The motivation of the defendants and their masters to gain control of the Union street properties goes beyound the land value and the direct profits the A. W. Perry's company and the three executives stand to make from properties located in the vicinity of the South Weymouth Naval Air Station development with the federal and local subsidies provided to it.

The A. W Perry company which operate as a real estate investment company and control the federal insured Rockland Trust Bank via a public corporation listed on the MASDAQ board (INDB symbole) is actively seeking large scale investment related to the air base development.

It apears that as part of this effort Mr. McGee's properties were used in presentations, potentially misleading investors by misrepresenting the ownership of the properties.    It apears that the misrepresentation had taken place around the time the now removed Judge, Mr. Livingstone, ordered that the properties will be sold and the defendants and other members of the organizations assumed that they have accomplished their original mission.  That decision however was reversed by another state court before any action was taken.  It apears that the properties were marked on Google maps by an A. W. Perry associate with a link to the Rockland Trust Bank Corporation, an A. W. Perry company, a link which imply to any potential investors who is reviewing the Air Base developmetn project area that the properties which apears as a large undeveloped site belong to A. W. Perry and are predestined for future developmetn of a company facility.  While is possible for every one with access to Google map and basic knowledge in computing to make this link the A. W, Perry company did not remove that link even that the link apears not far from a link to the company headquarters located near by at 288 Union Street.    It apears that the company was reluctant to remove the misleading link as it potentially already benefited from that misrepresentation and is hoping to solve the problem   by gaining control over the properties.    Those circumstance have made gaining ownership of the properties critical beyond any actual land value since the A. W. Perry company control the Rockland Trust bank via the publicly traded corporation and the information is potentially misleading anyone who is viewing the Air base developmetn site on Google. (The Printout of the Google maps is enclosed here in as Exhibit A)

Mr. Llewellyn's patrons in the on going corrupt enterprise described in this case are A. W. Perry executives who maintain the town of Rockland as their own controlled enclave since before Mr. Llewellyn arrival at his public position.  A. W. Perry had benefited extensively from Mr. Llewellyn illicit actions.  A. W. Perry's executive vice president, William, "Buzz" Constable, A. W. Perry Chairman Thomas Teuton, and A. W. Perry President John H. Spurr, Jr. appeared to have planed and directed Mr. Llewellyn falsification of selectman voting records which had resulted in the redirection millions of dollars out of the pockets of Rockland citizens and into A. W. Perry coffers. Having its origin in Rockland and manipulating the town public life for generations A. W. Perry executives carries the responsibility to political corruption that had made the town of Rockland notorious.

John H. Spurr, Jr., President of A. W. Perry, Inc. and Thomas Teuton, Chairman Of The Boards of A. W. Perry, acquired private properties in neighboring towns and stand to benefit from such investments both as A. W. Perry shareholders and private real estate investors.  However, it apears that the A. W. Perry executives have an interest, at least for the time being, to suppress property value in the vicinity of the project.  That goal is accomplished by the current members of the town

administration using the zoning board led by the defendant Mr. Manzella. It is also apears that A. W. Perry is hiding the full scope of the company involvement and interest in the Air Base project which include the building of a genetic engineering industrial park and residential development in the vicinity of the South Weymouth Naval Air Station.

Senator Morrissey is involved in the affairs of the town of Rockland through his employee, Mr. Michael Johnson who is a town selectman. Mr. Johnson, an attorney who belong to the same criminal enterprise has served as a member of the town's finance committee during a series of embezzlements by town employees who were placed and kept in their jobs by the criminal organization he belong to. Senators Morrissey and Creedon in their capacity with the Massachusetts State legislator Judiciary commissions yield influence on State Judges which they had used in this case.

The scope of the corruption described in this complaint involved state politicians who are continuing the historical legacy which during the Bulger brothers era resulted in a rain of terror inflicted on citizens by criminals protected by government officials. The organization is providing to his members life long security and protection treating them like life time employees regardless of their exposure as criminals. As detailed in this complaint The organization place people with liabilities and criminal history as employees and political appointees in state and local government and guarantees their employment and pension even if they are force to resign or loose their jobs because of criminal activities. In return those people cover-up corruption at their masters' will while getting limited freedom to abuse their positions as public servants for their own gain. This complaint also alleged wrong doing at local offices of federal agencies and the FBI.

The now removed Judge Michael Livingstone who was directed to act on behalf of the A. W. Perry executives by his masters, senator Creedon and Morrissey, and was removed from his position as a state judge by the Massachusetts Commission of Judicial Conduct half way through this case, is an example of the life-time guarantee the criminal enterprise provides to his members. He was allowed to avoid a public criminal trial and was provided with a public job with a pension. Also detailed in this complaint are illegal actions of other judges involved in this case, of attorneys who serves the criminal enterprise and receive its protection and of political appointees, some of whom still serving in the same public jobs and conducting the same critical roles for the criminal enterprise, assigned to them during the Bulger era by what appear to be predecessors of current members in the same criminal enterprise. This complaint includes information about an FBI agent who appeared to have been acted on behalf of this corrupt enterprise.

Those individuals who are not defendants in this case but are referred to in this complaint are involved in the same on going criminal enterprise as the three defendants in this case and have violated the federal RICO statute, the state law and, through their support of the defendants actions, Mr. McGee's civil rights. Their actions are described in this complaint in support of evidence against the three defendants. Adding those individuals as defendants to this case is beyond what Mr. McGee, who was robbed of a significant part of his properties, business, his money and his livelihood, can move without the Government help.

II. Parties

1. Plaintiff Kevin McGee ("Mr. McGee") is a citizen of the United States of America with a place of residence at 495 Union Street, Rockland, Massachusetts.

2. Upon information and belief, Defendant John Llewellyn ("Mr. Llewellyn") is a citizen of the United States of America with a place of residence at 275 Spring Street, Rockland, Massachusetts 02370.

3. Upon information and belief, Defendant Robert Manzella ("Mr. Manzella") is a citizen of the United States of America with a place of residence at 799 Market Street, Rockland, Massachusetts 02370.

4. Upon information and belief, Defendant Stanley Cleaves ("Mr. Cleaves") is a citizen of the United States of America with a place of residence at 38 Greenwood Street, Rockland, Massachusetts 02370.

III. Jurisdiction and Venue

5. This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1964 (c).

6. Venue is appropriate in this Court pursuant to 18 U.S.C. § 1965.
IV. Facts Common To All Counts

7. Mr. McGee has been in the automotive sales industry for approximately twenty years.

8. In or around 1997, Mr. McGee began to investigate the possibility of purchasing commercial property in Rockland, Massachusetts on which he could operate an automotive sales and service business.

9. Mr. McGee identified such property at 511 Union Street in Rockland, Massachusetts ("511 Union Street").

10. At the time, Nicholas Rusko owned 511 Union Street and operated a gas station and automotive service and repair business at the site.

11. In August and September 1997, Mr. McGee and Mr. Rusko negotiated the terms for the purchase of 511 Union Street. Mr. Rusko was represented by Shawn Cotter of Cotter & Cotter, a well-known law firm in Rockland, Massachusetts that often appears before the Rockland Zoning Board of Appeals.

12. On or about September 24, 1997, Mr. McGee and Mr. Rusko executed a Purchase and Sale Agreement for 511 Union Street (the "P&S").

13. In conjunction with the P&S, Mr. McGee also executed a Promissory Note in favor of Mr. Rusko to pay a portion of the purchase price for the property.

14. Under the Promissory Note and Rider A of the P&S, Mr. Rusko was entitled to "recover the property" from Mr. McGee if Mr. McGee "fail[ed] to operate at any time during three (3) consecutive months from the date of the note." Through this provision, Mr. Rusko appeared to be protecting the interest he retained in the property and, specifically, the "grand fathered" usage of the property as a service station.

15. At all times relevant to this Verified Complaint, Mr. Manzella was a member of the Zoning Board of Appeals of Rockland, Massachusetts ("ZBA"). In addition to being a member of the ZBA, Mr. Manzella is a prominent local developer and landowner in Rockland, Massachusetts. Mr. Manzella owns several commercial properties throughout the town, including Town Line Industrial Park. The street where Mr. Manzella resides,

Manzella Court, is named for Mr. Manzella's family. Mr. Manzella, and/or companies
he owns and/or controls, has substantial contracts with the Town of Rockland, including
the contract under which Rockland's new police station was developed. A telephone cell
tower that was recently installed on the Manzella-owned property, and for which Mr.
Manzella receives rent, was previously planned to be installed at the site of the new
police station. If the plan had gone forward as planned, Rockland, instead of Mr.
Manzella, would have accrued rental payments from the cell tower.

16. In the past, the Massachusetts Ethics Commission has investigated and fined Mr. Manzella
after Mr. Manzella admitted that he violated the Commonwealth's conflict-of-interest law
by appearing before the ZBA on behalf of his family's property management business,
Manzella & DiGrande, Inc.

17. Mr. Manzella leases space to several businesses that compete with Mr. McGee's
automotive dealership, including WC Automotive and Fader Motor.

18. Upon information and belief, at the time that Mr. McGee was negotiating the purchase of
511 Union Street, Mr. Manzella also was interested in purchasing 511 Union Street.

19. 511 Union Street is a valuable property in Rockland in that it is on Rockland's main
thoroughfare

20. 511 Union Street also allowed access to Union Street to several acres abutting the rear of
the property. That undeveloped property was assigned the address of 495 Union Street.

21. 495 Union Street had a separate private access road named Canterbury Lane.

22. A small residential house, belong to Mr. Joseph Croak, is located on Union Street between
495 Union Street access road (Canterbury Lane) to 511 Union Street. Over the years
Mr. Croak rented from the owner of 511 Union street a small strip of land next to his
house and used it as a parking space.

23. In addition, 511 Union Street is situated on the town main street leading to one of the main
entrances to the present site of the U.S. Naval Air Station in Weymouth, Massachusetts.
511 Union Street is about a thousand yards away from the entrance to the project and
even closer to the town's commercial center, which is in walking distance of the site and
where the A. W. Perry is located. Any traffic between the town's commercial center
and the development site must pass in from of 511 Union Street.

24. The U.S. Naval Air Station in Weymouth has been designated for transition to civilian use
and has become one of the largest commercial and residential developments on the east
cost with a significant subsidies of the Federal government.

25. At the time Mr. McGee had purchased the 511 Union Street property and started his business the Rockland Trust bank, an A. W. Perry company, had its data center operation at a building located at about 500 feet away the same side of Union Street at the town's center. The Rockland Trust bank was planning a needed expansion of its data center and the combined 511 and the land behind and to the side of it at 495 Union Street was considered as the largest undeveloped lot in the vicinity with the largest street frontage.

26. The commercial value of 511 Union Street is expected to substantially increase as the U.S. Naval Air Station development proceeds. Once this project is completed the value of both properties, 511 and 495 Union Street will increase even more to Mr. Llewellyn, Mr. Manzella and their associates as they are in control of the zoning status of Rockland properties. They can switch the zoning classification of land between wet land, commercial and residential at will as they did when they converted a 10,000 dollars wet land lot into Mr. Llewellyn house as detailed later in this complaint.

27. Upon information and belief, Mr. Llewellyn, Mr. Manzella and their associates has an interest in controlling access to 511 Union street.

28. Gaining ownership of 511 Union Street would have allowed Mr. Manzella to gain access and street frontage to 495 Union street.

29. Upon information and belief, Mr. Manzella acquired the knowledge that the P&S required Mr. McGee to maintain his license or forfeit 511 Union Street.

30. On or about August 20, 1997, the ZBA held a hearing on Mr. McGee's petition for a permit to allow the sale of used cars at 511 Union Street.

31. On or about August 26, 1997, the ZBA found that allowing Mr. McGee's petition would create "no increase in noise and traffic." On Mr. Manzella's motion, however, the ZBA decided to grant Mr. McGee's petition "with conditions."

32. One of the "conditions" was that Mr. McGee could only hold out for sale a "maximum of fifteen cars." even that state regulations allowed the property to handle 50 cars and even that similar businesses on the same street had no such restrictions.

33. Thereafter the ZBA issued Mr. McGee a so-called "Class II" license to buy and sell second-hand motor vehicles pursuant to Mass. G.L. c. 140.

34. Upon information and belief, Mr. Manzella began a covert campaign to instigate the revocation of Mr. McGee's license through the ZBA in furtherance of an unlawful scheme in which he would gain control of 511 Union Street.

35. In furtherance of his scheme, Mr. Manzella has used his position on the ZBA, and acted under color of state law, to harass and intimidate Mr. McGee and, ultimately, promoted an effort, that continues to this day, to put Mr. McGee out of business.

36. Upon information and belief, this effort has included Mr. Manzella's instruction, to Rockland's Zoning Enforcement Officer that Mr. McGee's property should be singled out for improper and excessive "enforcement" of the fifteen car limit under the August 20 permit.

37. For instance, on October 20, 1997, little more than a month after issuing a Class II license to Mr. McGee, Rockland's Zoning Enforcement Officer (the "Zoning Enforcement Officer") issued a letter to Mr. McGee in which he stated that "[o]n several occasions there have been more vehicles than what (sic) is allowed" at 511 Union Street. The October 20, 1997 letter is significant in its lack of specificity. It does not cite a specific occasion on which there had been excessive vehicles at 511 Union Street. It also does not indicate the person(s) reporting such violations. In fact there never was any evidence to support the contentions made in the October 20, 1997 letter.

38. In fact, 511 Union Street had never been in violation of the 15 vehicle limit.

39. At the time, Mr. McGee had no idea that Mr. Manzella was targeting his property. Mr. McGee focused his attention on working with the ZBA in good faith. It has only recently been discovered that Mr. Manzella falsely reported, through himself and Mr. Cleaves, that there had been violations of the so-called fifteen vehicle limit.

40. On or about November 19, 1997, the ZBA, through Mr. Manzella, then instructed the Zoning Enforcement Officer to issue an order to stop all activity under Mr. McGee's permit. The Zoning Enforcement Officer made such an order on November 20, 1997, subject to 511 Union Street coming into "full compliance" with the special permit.

41. On November 21, 1997, the very next day, Mr. McGee proved that he was in full compliance with the special permit. On that day, the Zoning Enforcement Officer was invited by Mr. McGee to inspect the premises.

42. The Zoning Enforcement Officer appeared at 511 Union Street on November 21 with Mr. Manzella. It is not within Mr. Manzella's job responsibility or authority to inspect such a site for compliance with a permit. That is the job of the Zoning Enforcement Officer.

43. In retrospect, and in consideration of the information Mr. McGee has recently obtained, it appears that Mr. Manzella's presence was intended to coerce the Zoning Enforcement Officer into finding a permit violation.

44. Ominously, Mr. Manzella proceed to tell Mr. McGee the following words: "you are not going to mane any business here", and then took the opportunity to indicate to Mr. McGee his interest in purchasing the property and asked Mr. McGee about a price for the property.

45. Mr. McGee indicated that 511 Union Street was not for sale. Mr. Manzella was angered by Mr. McGee's rebuff.

46. Despite Mr. Manzella's presence and the apparent pressure he exerted upon the Zoning Enforcement Officer on November 21, 1997, a permit violation could not be found on that date and the Zoning Enforcement Officer, to the consternation of Mr. Manzella, had no choice but to lift the previous cease and desist order.

47. Mr. Manzella continued his harassment less than two weeks later. On December 1, 1997, the Zoning Enforcement Officer issued a letter to Mr. McGee regarding his private, residential property, at the time at 100 Hartsuff Street in Rockland. In the December 1 correspondence, the Zoning Enforcement Officer states that his office was "acting on a complaint by The Zoning Board of Appeals." Upon information and belief, this complaint regarding Mr. McGee's private property was levied by, or at the behest of, Mr. Manzella in furtherance of his racketeering scheme and was meant to display to Mr. McGee that should he fail to accede to Mr. Manzella's demands, Mr. Manzella would use the ZBA to harm even Mr. McGee's personal residence.

48. Upon information and belief, Mr. Manzella continued to instruct the Zoning Enforcement Officer to selectively monitor Mr. McGee's properties from 1998 to the present.

49. On March 12, 1998, the Zoning Enforcement Officer issued a letter stating that any violations of Mr. McGee's permit would result in immediate notification to the ZBA and a "request ...to permanently revoke The Special Permit issued to you for this property." Upon information and belief, such letters were not sent to other similarly situated permit holders. Upon information and belief, the letter was simply another attempt to harass and intimidate Mr. McGee and was issued in furtherance of Mr. Manzella's scheme. In retrospect, there could be little other explanation for the letter. The letter does not cite any violations of the permit - only the warning that unspecified violations would result in a permanent revocation of Mr. McGee's permit. As shown above, such revocation would lead to the forfeiture of Mr. McGee's ownership of the property itself.

50. In June, 1998, the ZBA issued a second Class II license to Mr. McGee. The June 1998 license, however, was issued for only six months rather than a year as is customary. The Zoning Enforcement Officer, Douglas Jeffreys, admitted to Mr. McGee that he had never seen such a permit issued by the ZBA and was surprised that Mr. McGee was not granted a one year permit.

51.   On December 30, 1998, the Town Administrator, Kevin Donnovan, called Mr.
      McGee and admitted that issuing a six month Class II license was improper and that he
      was deeply sorry for the inconvenience that Mr. McGee had encountered with the ZBA.
      Mr. Donnovan advised Mr. McGee that he would receive an appropriate one-year
      license the following week.

52.   Despite Mr. Manzella's efforts, Mr. McGee's business prospered.  By early 1999,
      less than two years after beginning his business at 511 Union Street, it was clear to Mr.
      McGee that his business could be more profitable if he could increase the amount of
      vehicles he could display and sell on his lot. At this time, Mr. McGee did not understand
      that Mr. Manzella, one of the town's duly appointed officials, was engaging in an
      extortion and bribery scheme to gain control of his property in violation of RICO and his
      civil rights.  This perception would later change due to Mr. Manzella's continued
      conduct and the independent evidence Mr. McGee would later receive.

53.   In early 1999, Mr. McGee made a petition to the ZBA to increase his used car
      license from 15 to 50 cars.  Mr. McGee submitted an engineering survey to the ZBA
      that indicated that 511 Union Street could safely and reasonably accommodate up to sixty
      five (65) vehicles.

54.   The ZBA scheduled a hearing on Mr. McGee's request for April 6, 1999. Again,
      Mr. McGee was unaware of Mr. Manzella's scheme and expected the ZBA to act in
      good faith on this request.

55.   On March 30, 1999, however, merely one week prior to the hearing on Mr.
      McGee's request, the Zoning Enforcement Officer issued a letter to Mr. McGee in
      which he claimed that certain flag banners at 511 Union Street violated "Condition #1
      under the Special Permit issued … on August 20, 1997."  This letter was curiously
      timed in that: (1) the banners had been displayed since the time that Mr. McGee first
      opened the dealership in 1997 and the Zoning Enforcement Officer had never before
      commended upon them; (2) the banners were flying at the dealership on November 21,
      1997 when both the Zoning Enforcement Officer and Mr. Manzella appeared at the site
      and the Zoning Enforcement Officer declared that the site was in "full compliance with
      the conditions of the Special Permit" issued on August 20, 1997; and (3) Mr. McGee's
      request for an increase in cars was to be heard by the ZBA in about one week.

56.   Nonetheless, Mr. McGee proceeded in good faith.  Prior to the April 6, 1999
      hearing, Mr. McGee contacted his neighbors regarding his proposed increase in cars at
      the site.  The neighbors unanimously supported Mr. McGee's efforts and affirmatively
      stated to the ZBA that Mr. McGee has been a model neighbor and had significantly
      improved the property.

57.   Despite these endorsements and Mr. McGee's engineering survey, the ZBA denied
      Mr. McGee's request at the April 6, 1999 hearing.

58.   On October 15, 1999, the ZBA then took another unprecedented action: unilaterally requesting that Mr. McGee's neighbor, Joseph Croak, submit "grievances" against Mr. McGee to the ZBA.  As a result, Mr. Croak did submit a letter containing grievances to the ZBA on October 28, 1999.  Upon information and belief, this letter was obtained in furtherance of Mr. Manzella's scheme and constituted bribery. Importantly, Mr. Croak submitted the "grievances" despite the fact that he had, on April 2, 1999, executed a statement to the ZBA in which he supported Mr. McGee's request to expand his business at 511 Union Street.

59.   It was also odd that this request for grievances was made shortly before Mr. McGee was to appear before the ZBA for his yearly Class II license.  At this time, Mr. Croak then refused, citing the authority vested in him by the ZBA, to pay Mr. McGee rent for use of Mr. McGee's driveway as the parties had previously agreed.

60.   In yet another unprecedented move, the ZBA then issued a Class II license "ONLY GOOD FOR SIXTY (60) DAYS" on December 6, 1999.

61.   At the hearing on this license, several references were made to written complaints regarding violations by Mr. McGee on the August 20, 1997 permit.  In fact, the ZBA recommended to the Town Selectman that Mr. McGee's license not be renewed at all based upon these supposed allegations.  The ZBA was unable, however, to produce written complaints, other than the complaint that he been solicited from Mr. Croak, to either the Selectman or Mr. McGee.  As a result, the Selectman were dismissive of Mr. Manzella's oral representations regarding these phantom "complaints."

62. Surprised by the references to undocumented "complaints", Mr. McGee requested in writing, on or about December 9, 1999, that the ZBA provide to him all allegations of zoning violations against him.  The ZBA was unable to do so - - for approximately 90 days.

63. Thereafter, two written complaints dated nearly a year earlier, suddenly appeared in Mr. McGee's file.  These complaints were purportedly from Mr. Cleaves, then an associate member of the ZBA.  In a letter that he dated April 23, 1999, Mr. Cleaves alleges that he witnessed 32 cars at 511 Union Street.  In a letter he dated April 28, 1999, Mr. Cleaves alleges he witnessed 27 cars at 511 Union Street. There are two glaring irregularities with these letters: (1) it was not Mr. Cleaves' role to make such inspections and, upon information and belief, it was unprecedented for him to do so; and (2) Rockland's date stamp, which is always clearly legible on documents received by the Town, is illegible on these two documents.

64.   Upon information and belief, Mr. Cleaves fraudulently added these "complaints" to Mr. McGee's file After the fact in furtherance of the scheme to destroy Mr. McGee's business.

65.   Thereafter, the ZBA held a public hearing on February 9, 2000 to determine
      whether to suspend or revoke Mr. McGee's permit. The ZBA decided not to revoke the
      permit, but rather to modify the permit. The modifications made on February 9, 2000
      were in large part unconstitutional and unlawful.

66.   The February 9, 2000 decision of the ZBA is being appealed in the Massachusetts
      Superior Court for Plymouth County.

67.   Upon information and belief, the February 9, 2000 decision of the ZBA was
      instituted at the behest of Mr. Manzella in furtherance of his scheme to wrest control of
      and/or extort 511 Union Street from Mr. McGee.

68.   Among the flagrantly unconscionable and/or unconstitutional modifications to the
      permit are the following: An unconstitutional fiat that states that "any deviations from
      these conditions will trigger an automatic revocation of the special permit dated August
      20, 1997 without any further hearings." A requirement that there be no off-site parking.
      This would allow the ZBA, specifically Mr. Manzella and Mr. Cleaves, to monitor
      whether private individuals park in public parking on Union Street. Should such
      individuals then visit Mr. McGee's business, the ZBA would immediately revoke Mr.
      McGee's license. Of course, Mr. McGee has no control over whether individuals use
      public parking and, thereafter, visit his dealership. A mandate to the Zoning
      Enforcement Officer "to investigate the issue of whether there are other businesses
      operating from the site illegally, without permits or approvals from the ZBA", despite
      the fact that there has never been any evidence to suggest such infractions by Mr.
      McGee. A requirement that Mr. McGee spend resources redirecting, shielding or
      removing outside lights that have been at the site for many years. A requirement that
      Mr. McGee expend resources to create buffer zones with arborvitaes on the north side of
      the property and five feet of grass (which is presently concrete) on the west side of the
      property. Other similarly situated businesses do not have to do so. In addition, Mr.
      Manzella actually indicated at this hearing that these so-called buffer zones were
      unnecessary. In fact, as a show of intimidation towards Mr. McGee, Mr. Manzella set
      forth these arbitrary and unreasonable requirements in a gleeful and sneering manner.
      The ZBA, through Mr. Manzella, then purportedly "waived" the buffer zone on Mr.
      Croak's side of the property purportedly because there has been a driveway there for
      "thirty-five" years. Incredibly, by "waiving" this buffer, the ZBA purported to provide
      the Croak's and their successors, an interest (i.e. a prescriptive easement) in Mr.
      McGee's property.  In addition to the notation that the driveway had existed for
      thirty-five years, the ZBA held that : "Cars from Mr. McGee's Used Car Annex lot shall
      not be parked on the driveway. Driveway is to be used by the Croaks or their
      successors." Upon information and belief, the ZBA, through Mr. Manzella, bribed Mr.
      Croak. Upon information and belief, the interest purportedly conveyed by this permit
      was in exchange for Mr. Croak's fraudulent and belated list of grievances submitted in
      October 1999. This conclusion is supported by the fact that at or about this same time,
      Mr. Croak, who had entered into a private contract with Mr. McGee for use of the
      driveway, suddenly proclaimed that he would no longer abide by that contract via
      authority granted by the ZBA. In a February 20, 2000 letter, the Zoning Enforcement
      Officer then issued a cease and desist order purportedly in furtherance of the February 9,
      2000 decision by the ZBA. That cease and desist order is believed to have been at Mr.
      Manzella's direction and in furtherance of his scheme. The cease and desist order stated
      that Mr. McGee exceeded the scope of the original permit by servicing cars owned by
      outside dealers and the general public because the building was vacant at the time of the

issuance of the original permit. The ZBA took this unreasonable position despite the fact that the previous owner of the site maintained a gas service station with a repair shop and, obviously, it's primary business was servicing cars owned by outside dealers and the general public.

69.   in the spring of 2000 Mr. McGee was approached by Attorney Cotter, who later had represented Mr. Croak, regarding Mr. Croak's potential purchase of the driveway at a distressed price. Mr. Cotter told Mr. McGee that if he agreed to sell the driveway to Mr. Croak, his "troubles" with the ZBA would disappear. In the fall of 2002, Mr. Robert K. Bold advised Mr. McGee that he had overheard Mr. Cleaves speaking to one of Mr. McGee's competitors and that Mr. Cleaves had advised the competitor that: "I can't wait to put [Mr. McGee] out of business." A true copy of an affidavit provided by Mr. Bold is attached hereto as Exhibit 1. Mr. McGee has also recently learned that Mr. Manzella sought to obtain the termination of Rockland's Zoning Enforcement Officer in the summer of 2002 because, in Mr. Manzella's opinion, the officer was not being aggressive enough against Mr. McGee. The harassment has continued to this day. In early 2003, town police scanners indicated that there had been an order that the police specifically patrol and monitor Mr. McGee's lot and count cars on his lot. This is not the job of the Rockland Police. Also in 2003, Mr. Cleaves has been caught, first, trespassing on Mr. McGee's property - - apparently to count cars on Mr. McGee's property - - and, then, spying and taking photos of the property while Mr. McGee attempted to service customers. In one such instance, a female customer was so uncomfortable with Mr. Cleaves' tactics that she departed the premises.]

70.  Since the initial confrontation with Mr. Manzella On Mr. Llewellyn instruction and at Mr. Manzella's request police officers visited Mr. McGee's car business and reported to the zoning board the number of cars even that such inspections are supposed to be carried by the building inspector and the regular visits by Police cruisers interfered with customers and constitute harassment.

71.  In 1997 Mr. McGee and his wife at the time Mrs. Barbara McGee (previously Chandler) built a house on land given to them given to them by Mrs. McGee's father, Burton Chandler at 100 Hurtstuff Street, Rockland, about a mile  from where the McGee Car business was located.

72.  The McGee's house was located next door to the Chandler's house

73.  Mrs. Barbara McGee's brother, David Chandler, was living with his parents in the Chandler's house. David Chandler, was a convicted drug dealer who was being employed by the Rockland Police Department as a drag informer.

74.   Also living in the Chandler's house was 15 year old Richard Chandler, the son of Mrs. McGee sister who was abandoned by his mother and being raised by his grandparents.

75.  Richard Chandler was attending the Rockland High school and was spending much of his free time at the McGee's house playing with the McGee's seven years old child and using the swimming pool and an all Terrain vehicle at the house.

76  On an early evening hours of a Friday on October 2004 Mr. McGee and his wife had witnessed from their bedroom Windows on the second floor of their house, the 15 years Richard Chandler watering what seemed to a patch of new Marijuana plants on the abutted property where the child lived with Mrs. McGee's parents and her brother David Chandler.

77. Mr. McGee and Mrs. McGee became gravely concern since Mrs. McGee Brother, David Chandler, a convicted drug dealer and a Police drug informant was observed by town resident to hang around the Rockland high school as part of his duties as a drug informant and was "bragging" about using and distributing drugs while working with the police.

78. The 15 year old child, Richard Chandler was a close playmate of the McGee's child, who was half his age and who was looking up to him. Richard Chandler, who abandoned by his mother was highly vulnerable to bad influence from his grand father, a violent alcoholic who was later convicted in connection to events and to David Chandler, his uncle, also an alcoholic, who was aggrandizing his drug related deeds. In the few month prior to that Friday incident Richard started to have problems in high school and was getting closer to David chandler.

79.  Mr. McGee confronted his father in law, Mr. Burton Chandler who owned the abutted house where the plants, visible from the McGee house, were planted.  To his surprise Mr. Chandler appeared to support Richard drug activities.

80.  Based on Mr. Burton Chandler response Mr. McGee and Mrs. McGee developed a suspicion that the plants were marijuana plants which were planted by David Chandler and that it is very likely that the existence of those plants is known to the policemen who operated Mr. David Chandler as a drug informant.

81  After more confrontation and heated exchange between Mrs. McGee and her father and brother Mrs. McGee obtained a protection order against her father Mr. Burton Chandler.  In the exchanges with her family members Mrs. McGee brought up the possibility that Mr. McGee. who have some family and friends woe are serving in law enforcement agencies will approach the state police regarding the involvement of a minor child in drug activities with a police informer operating purportedly in proximity to the Rockland High School. Her father responded with threats that Mr. McGee will be arrested by the Rockland Police before he can do that.

82  A few days later on a working day Mr. McGee was served with a protection order obtained with the help of the Rockland Police Department by Mr. Burton Chandler, as the custodian parent of the Richard Chandler.  Claiming that the child reported being threatened by Mr. McGee Mr. Burton Chandler obtained a protection order directing Mr. McGee to keep a distance of 20 feet from Richard Chandler at all time.

83. During the morning of that day Mr. Burton who was visibly drunk and who was later convicted by the Hingham District Court for the events that took place during that day harassed his daughter, trespass into the back of the McGee house after breaking a lock on the back gate and threaten his daughter saying that Kevin (Mr. McGee) is going to be arrested.

84. Mr. McGee from his place of business then called Mrs. McGee and told her about the protection order he was just served with.

85. Mrs. McGee under great duress calls friends asking them to come to the house and told Mr. McGee on his cellular phone, still at his place of business that she believe he will be arrested for violating the protection order if he approached the house, asked him to watch for entrapment and bring with him friends to server as witnesses.

86. Later that afternoon Mr. Burton Chandler and the child Richard chandler left their house, the older man carrying a six pack of beer and the child crying a pick ax, a hoe and a post with a no tress pass sign. The two arrived at the beginning of the McGee house driveway.

87. Mr. Burton Chandler then directed the child to start digging a hole in the ground at the entrance to the McGee's house driveway. The child start digging and attempted to positioned the pole with the no trespass sign. Mr. Burton Chandler who was the original owner of the property before giving it to his daughter and her husband had claimed that the driveway was still his own property.

89. While the child was digging Mr. Chandler started to curse his daughter who was video taping the events. He preformed obscene movements in her direction and then proceed to walk toward the back of the house where a few hours earlier he cut the lock and left the gated back unprotected.

90. Mrs. McGee then, visibly shaken, run out of the front of the house, entered into her car and drove away.

91. Mr. Burton Chandler then returned to the child and the two went back into their house.

92. According to testimony later given in the Hingham District Court a few minutes later a police cruiser with at least two police officers in it was observed passing the McGee's house on 100 Hartsuff Street and parked behind a line of trees which separated the McGee driveway from a parking area at the end of the dead-end Hurtstuff street. The cruiser backed up until it was completely hidden from the street.

93. As soon as the police cruiser was positioned behind the trees Mr. Burton Chandler and the child Richard chandler left their house again and returned to the corner of the driveway where they had previously left their pickax, hoe, post and the no trespass sign.

94. A short while later Mrs. McGee returned to the house. She stopped her car further away from the driveway where her father and nephew were standing and run into the house.

95. After more phone calls Mr. and Mrs. McGee agreed that Mr. McGee should not come back to the house alone and will bring a witness with him. One of his tenants in a rental building he owned across the street from his business.

96. Mr. McGee then called a friend, Captain Joe Rieley, from the Plymouth County Sheriff department, who after hearing the details decided to drive to Mr. McGee house.

97. Mr. McGee arrived at the house with his tenant, Edwin Gonzoles, at his side, he parked his car and the two entered the house.

98. As soon as Mr. McGee entered the house the Police Cruiser which has been hidden behind the trees moved to the front of the McGee house. A short exchange took place between Mr. Burton Chandler and the police and a policemen proceed to the front door of the house and requested Mr. McGee to come out. The police then informed Mr. McGee that they are about to arrest him for violating a protection order.

99. Mr. McGee pointed to the fact that the chain of event made such violation impossible and that a witness who was with him in the car can verify that. While the exchange took place additional policemen led by Mr. Llewellyn arrived on the scene.

100. Mr. McGee was about to be taken into custody when the Sheriff Department cruiser with Mr. McGee's friend, Captain Joe Rieley arrived on the scene. The captain had some exchange win the police and expressed astonishment regarding the police behavior. The police then announced that they will charge both Mr. McGee and Mr. Burton Chandler by mail and left the scene without performing an arrest.

101. A few days later Mr. McGee was charged by mail with violating the protection order by approaching Richard Chandler.

102. In the trial that followed in the Hingham District Court Mr. McGee was acquitted of all charges after the entire event was described in details by witnesses and analyzed in court.

103. A few days after that attempt to arrest Mr. McGee, at about 6:30 in the evening soon after Mr. McGee returned to his house from his business a group of Rockland policemen led by sergeant Jack Wentworth, the Rockland Police officer in charge on narcotics investigations and on information and belief, the officer who is controlling Mr. David Candler as a drug informant, stormed into the McGee house.

104. Officer Wentworth presented a search warrant obtained from a judge on Jun 11 2004. The search warrant was based on Officer Wentworth affidavit. The state court later determine that it was based on false information and dismissed all charges stemmed from the search that followed it.

105. On information and belief John Llewellyn who was at the time the second in command at the police force and had to be informed and to approved any such activities by members of the police force had laid out Officer Wentworth' affidavit.

106. When Officer Jack Wentworth enter Mr. McGee's house and conducted a search for firearms. At their demand Mr. McGee opened a locked safe. The Police confiscated a licensed hunting rifle which was held by Mr. McGee with no ammunition. Mr. McGee was then arrested and the Police department under Mr. Llewellyn supervision filed charges against him.

107. When the case arrived at the Hingham District Court it was determined by the Judge that the search warrant use by the police to storm the McGee house was obtained by lying to a Judge. The Hingham District court Honorable Judge Ronald Moynahan determined that the police obtained the warrant by claiming that fresh evidence complying with the 30 day fresh evidence rule existed and that those evidence indicted that a loaded firearm was being kept in the house. The Judge determined that the person who the police alleged they obtained their information from, Mr. David Chandler, the estranged brother of Mrs. McGee and the very drug dealer operated by sergeant Jack Wentworth under the supervision of Mr. Llewellyn, had told the police that he did not visited the McGee house in more than a year and had no information regarding the licensing of a fire arm if such firearm actually existed. The judge ordered the case dismissed and the hunting rifle returned to Mr. McGee.

108. On Jun 11 2004 Rockland Police officer Wentworth submitted an affidavit in request for a warrant for a search the McGee house. Officer Wentworth started by highlighting his carrier high points and qualifications. He described himself as the commander of the criminal investigation bureau of the Rockland police department and stated that he attended and graduated from numerous specialize training schools and seminars dealing with narcotics and narcotics investigations, that he had been involved in hundred of narcotic arrest in "surrounding towns".

109.   Using the word "surrounding towns" in the officer Wentworth affidavit is significant because the Rockland Police statistics of narcotic arrests and charges brought for narcotic violations show that drug users and traffickers in Rockland operating in relative immunity from arrest and prosecution in comparison the neighboring town. The Rockland Police Department rarely bring charges and when it does it is only because outside agencies get involved. In a number of documented cases case complaints files against residents trafficking by neighbors who observed the contain traffic including accidents which took place in the vicinity of known drug dealers went unheeded. In one case a complaint was filed about a house on Union street. Officer Wentworh who received the complaint from a public official in town because the drug activity was taking place in right across from the official place of residence responded with the following words: "I cannot do any thing because I can not do any undercover drug buys because I went to high school with him and he knows what I look like". No further action was taken by the police in the case.

110. Officer Wentworth continued in his affidavit: "I have spent thousands of hours conducting surveillance of drag dealers. I have became familiar with the patterns use in the use of narcotic by drag dealers. As a result of my previous investigations I have sought and received search warrants. I am the narcotic enforcement officer for the Rockland police department. I have testified in Brockton Superior Court and in Hingham District Court in year 2000 as an expert witness in Narcotic in the case of commonwealth vs. Gordon Obrien."

111.   Officer Wentworth then continued to describe information received from David Chandler, the convicted drug dealer working for officer Wentworth as a drug informer and from the Burton Chandler, the father of David and the owner of the property where the Marijuana plants which Mr. McGee confronted Burton Chandler about and Mrs. McGee complain to the Police who refused to take action, were being grown.

112.   Officer Wentworth conduct a raid and a search on Mr. McGee house based on the search warrant obtained from a judge based on the above affidavit. Officer Wentworth then filed charges against Mr. McGee.

113.   The charges were dismissed by the Hingham District Court Honorable Judge Moinahan after the court determined that the warrant have been obtained illegally and contain false statement to a judge and that nothing which was found in the search was held in violation of the law. The licensed firearm taken by officer Wentworth during the raid on Mr. McGee house was ordered returned to Mr. McGee by the court.

114. When Mr. McGee went to retrieve his property he was confronted by sergeant Jack Wentworth who refused to abide by the court order to return it. A discussion then took place in from of a judge and the property was eventually returned.

115. A few day after the encounter with Sergeant Jack Wentworth Mr. McGee received a by mail charges filed against him by the Hingham Police who has Jurisdiction over the Hingham district court site. A complaint for intimidation a witness was filed by sergeant Jack Wentworth claiming that Mr. McGee intimidated him in front of the Honorable Judge Hurley who ordered him to returned the property to Mr. McGee.

116. When Mr. McGee arrived to answer the charges they were dismissed outright by the pre trial magistrate who determined that there was no case and no intimidation of a witness could have taken place. The magistrate expressed astonishment over the police action.

117. Following Mr. McGee arrest on the weapon charges Mrs. McGee filed a police report about the Marijuana plants grown by her brother on the abutted property and tended to by her 15 year old nephew who was now skipping classes. The plants were clearly visible from the McGee's bedroom Window. Mrs. McGee and Kim Chandler, her niece who was staying with her, called the Rockland Police department and reported the clearly visible plants. A Police cruiser arrived at the house and two policemen were shown the plants on the abutted property. The policemen refused to take any action claiming that they do not have a warrant to go into private property. They further indicated to Mrs. McGee and Mrs. Kim Chandler that it will be best for them not to get involved, and left.

118. Despite obtaining a protection order against her father, Mr. Burton Chandler, and her brother, Mr. David Chandler, ordering both to stay away from her and the McGee's child Mrs. McGee continued to face daily harassment by the two of them. When she called the Police to request protection based do the protection order the Police dispatcher responded in those words: "We are not taking any more calls from this address".

119. Facing daily harassment, fearing entrapment by the police which was covering the drug activist of David Chandler and concerned about the impact on their son the McGee's felt they have no other choice but to move away from the house they have built on Hartsuff Street.

120. Knowing that their house is likely to be broken into by Mr. brother and father who stated so repeatedly as soon as they move out and facing vocal confrontations with the father who threaten and intimidated potential buyers and real state agents claiming that he still owned the McGee driveway and not being able to receive protection from the police the McGee's found it impossible to show the house to potential buyers or to move out and leave the house empty.

121. Fearing for their safety and freedom the McGee's agreed to an offer they received from Mr. Kevin Pratt, a Rockland Selectman and a friend and political ally of Mr. Llewellyn, his former chairman on the town board of selectman. Because his relationship with Mr. Llewellyn Mr. Pratt was the only one in position to buy the house without fearing the Chandlers.

122. The house which was only a few years old and had a swimming pool was estimated by real estate agents to be worth 585 thousands dollars and was placed on the market at that price. However, it had to be sold to Mr. Kevin Pratt for 430,000. The intimidation by Mr. Burton Chandler and Mr. David Chandler with the Rockland Police backing them up and refuse to respond and end their intimidation and harassment despite the protection order Mrs. McGee obtain against them prevented the McGee's from conducting a normal sale of their house forced the McGee's to agree to sell the house to Mr. Pratt at a substantial loss.

123.  Throughout the ordeal Mr. and Mrs. McGee were under a significant duress and
      were concern for their safety and the impact the arrests and police entrapments had on
      their seven year old son.

124.  After the house was sold the moved out of the house on Hartsuff Street. The
      harassment of Mr. McGee business by Mr. Manzella in his capacity at the Zoning
      Board of Appeals and Mr. Llewellyn in capacity as the chief of Police continued. Mr.
      McGee started his own investigation to get the bottom of the motives and connection
      between the two. Mr. McGee found himself harassed by various people who were
      either directly employed by Mr. Llewellyn or were placed by him in official positions
      when he was the Chairman the board of selectman and realized that there is a common
      pattern and a history of illegal activities unifying and connecting the two of them to A.
      W. Perry acclivities in the town.

125.  One of the people who was placed in his job by Mr. Llewellyn and had was involved in
      such activities was Kenneth Karlson, Rockland Conservation Commission Chairman.

126.  While serving as the Conservation Commission Chairman Mr. Karlson appeared in Mr.
      McGee business, expressed interest in buying a dump truck which was for sale, took it
      for a test drive without leaving a deposit and never came back. After using the track
      for work the dump truck was found at the side of the road and was taken by the town
      to the town public work department parking lot where it had caught fire. The police
      was not helpful in filing charges again Mr. Karlson nor in helping to document the
      events in order to try to recover damages from a public official who held a significant
      power over the status and zoning of properties in Rockland.

127.  Becoming aware of the special relations between Mr. Llewellyn and Mr. Karlson Mr.
      McGee asked the town for all public records related to the two.

128.  The records documented how the Rockland Conservation Commission Kenneth Karlson
      helped Mr. Llewellyn, and Mr. Manzella to manipulate the value of a wet land lot on
      which Mr. Llewellyn eventually built his house. Mr. Karlson bought a lot classified as
      a non buildable wet land from a Rockland Town Fire chief, Mr. Sammon, for 10,000
      dollars. The Rockland Zoning Board of Appeals lead by Mr. Manzella and with the
      support of Mr. Cleaves and based on the determination of the Rockland Conservation
      Commission led by Mr. Karlson and a botanist, Mr. Ziggler, then changed the lot
      classification from a wet land to a buildable lot. A builder who was retained by Mr.
      Llewellyn then obtain a construction loan and purchase the lot for 260,000. A 400,000
      dollars house then was built on the that same formerly wet land lot for Mr. Llewellyn.
      On information and belief the construction loan as well as the mortgage were obtained
      from Rockland Trust, a bank which is controlled the A. W. Perry company where Mr.
      Llewellyn tree patrons and backers, William, "Buzz" Constable, A. W. Perry
      Chairman Thomas Teuton, and John H. Spurr, Jr., President of A. W. Perry, are
      involved with day today decisions down to the allocation of individuals loan.

129.  During August 2005, the Massachusetts Office of the Inspector General investigated Mr.
      Karlson's involvement in corrupt activities involving his official position while serving
      as Chairman of the Rockland Conservation Commission. Mr. Karlson, while serving
      on the Rockland Conservation Commission, wrongfully appropriated property
      belonging to the Rockland Conservation Commission for himself, blackmailed
      developers who had business before his commission, forced them to take him as
      partner and stole from them.

130. The Rockland Police Department investigated Mr. Karlson, however, it appears that the department did not filed charges and in fact was protecting Mr. Karlson until it was forced by the State Inspector General to file charges which resulted in a criminal conviction with a two years suspended sentence and probation.

131. On information and belief Mr. Llewellyn was aware at the time he orchestrated the hiring of Mr. Karlson that Mr. Karlson had an extensive Criminal History recorded at the Massachusetts Criminal History Systems Board (CHSB). According to a letter by the Inspector General this information has been deemed a public record and consisted of some nine pages long. It included numerous arrests and convictions for such things as larceny, breaking and entering, possession of a controlled substance, assault and battery with a dangerous weapon, and assault and battery on a police officer.

132. The Massachusetts Inspector General had this to say in a letter to the town selectman after investigating Karlson's actions: "any reasonable Town official who might have reviewed Karlson's record before his appointment to the RCC would have concluded that the appointment was not in the best interest of the citizens of Rockland."

133. On information and belief, at the time Mr. Karlson was hired by the Town of Rockland, Mr. Llewellyn in his capacity as a Rockland Police officer had detailed knowledge of Mr. Karlson's Criminal History. As a town Selectman Mr. Llewellyn was involved and had to approve the hiring Mr. Karlson. Mr. Llewellyn has positioned Mr. Karlson where he can control the conservation commission power to recommend and effect land zoning status changes between buildable and non buildable in order to profit himself and his associates.

134. Mr. Llewellyn in his capacity ad a Rockland Police Chief, and as the most influential town official is continuing to place people with criminal past who would owe him for protection in town positions where they can act on his behalf. On information and belief Mr. Llewellyn coordinated the rehiring of a former town accountant after that accountant was arrested on drag charges. On information and belief the accountant's investigation was interfered with and manipulated by Mr. Llewellyn who devised a plan to keep the accountant out of jail. With Mr. Llewellyn orchestration the accountant was put to work as a police informant and a bait in another arrest which may have never taken place otherwise. The accountant then testified for the prosecution and in return for his grand jury testimony has avoided a jail. Mr. Llewellyn then orchestrated with his former colleagues on the board of selectman and the town administrator the rehiring of that accountant to his old position as the town accountant.

135. The accountant, Mr. Eric Hart testified in the Brockton Superior Court case number PLCR2006-00632 Commonwealth V. Mrs. Clear Keller. On information and belief Mr. Hart's arrest for drug violations was forced upon the Rockland police department by his girlfriend at the time who was attacked at her house. Eric Hart worked as town accountant during a number of frauds which have taken place under Mr. Llewellyn watch as a board of selectman chair. On information and belief Mr. Llewellyn objectives in orchestrating Mr. Hart's rehiring was keeping his organization men in a position essential to his organization ability to monetize its activities and to show to other members of his enterprise that he can protect those who are loyal to the organization.

136. A provision town police and fire employment contract referred to as the longevity or bump clause stipulates that an employee may receive between a 3 a 9 percent increase of their base salary for 3 years fate an employee reaches the 20st year of

employment with the town.  Eric Hart, the town accountant interpreted those provisions as compounded so employee receiving a 9 percent increase on its base gallery will get the 2nd year 18 percent and the in the 3rd year 27 percent. Approximately 20 employees of the police and fire department are currently benefiting from this erroneous interpretation.

137.   When the South Weymouth Naval Air Station redevelopment was discussed publicly Mr. Hart in his capacity as a town accountant supported the project even that no financial information existed to support the revenue projections which were introduced by the South Shore Tritown Development Corporation and the Project Master developer L. N. R.

138.   During the course of Eric Hart employment as a town accountant and while Mr. Llewellyn was a Selectman the following incidents have taken place: Mr. Hart purchased a cellphone subscription using public funds and used in what he described in his grand jury testament as his "wholesale drug business".  Mr. Hart approved invoices payed for purchasing of tires and other equipments with no reference to town vehicles. Mr. Hart mistake in tax levy estimate had cost the town 40,000 dollars. Mr. Hart signed and approved Mr. Karlson purchases for his own use as well as a 5000.00 dollars for a cell phone account used by Mr. Karlson while his criminal activities were taking place. Mr. Hart allowed a single person to sign approval of purchases requiring a majority approval of committees.  Mr. Hart during his employment as the manager of the town budget of approximately 46 million dollars operated a wholesale drug distribution business.

139.   After Rockland selectman, Mr. Michael Zupkofska, filed a larceny complaint against an elected town official, Mr. Robert Corvi, the town highway superintendent, Mr. Llewellyn took over the investigation rather then let it be assigned it to a detective as normal procedure would dictate. Mr. Llewellyn's objective in taking over the investigation appeared to have been his direct involvement in the approval of the allegedly illicit action by the town official during previous years when Mr. Llewellyn Himself As A Selectman And Board Of Selectman Chairman Allowed That specific alleged larceny to take place.  Even that Mr. Llewellyn investigation concluded that monies were paid to the elected official and that there was no legal support to justifying such payments Mr. Llewellyn found no probable cause to bring charges.

140.   Mr. Llewellyn was on the board of selectman when a number of considerable frauds were committed by town officials.

Thomas Hannigan Junior was the town of Rockland Water commissioner. He eventual was caught taking kick backs from contractor of approximately 30,000 dollars and for writing checks to Mr. Gregory Thompson the town sewer department super intendant. Gregory Thompson, the town superintendent was convicted for emblazing almost a million dollars along with the manager of a company named U. S. Filter, a company hired by the town to run the town sewer treatment plant.

141.   Mr. McGee continue to gather information about Mr. Manzella and discovered that Mr. Manzella was convicted by the Massachusetts ethic commission for relocating a public project generating income which was assigned by the town planning body to the location of a new Town Police Station on to his own property ad directing the rental income into his own pocket.

142.  Mr. Manzella, in collaboration with Mr. Llewellyn, who at the time was both a
      selectmen and a member of the Rockland police force, has use his position as the
      Zoning Board of Appeals to sell the town his land for a building of a new town's police
      station building and than to take the job of the general contractor / clerk who built the
      station.  After taking over the job Mr. Manzella, identified an income generating town
      property, the cellular antenna transmission tower which was already planed and
      approved to be built at the police station site. Mr. Manzella contacted the cellular
      phone companies which were paying for the transmission tower and rent and
      renegotiation with them to move the tower location from the town property at the new
      police station to his own land at the Manzella Industrial Park at the end of Manzella
      Street at the edge of town.

143.  The Antenna tower and transmitters produces rental income which was figured in the
      town's budget for the new Police Station and as continues rental income which would
      contribute to the town budget thereafter.  Mr. Manzella's actions redirected that income
      to Mr. Manzella pocket.  The original Police station was selected as the cellular
      antenna transmission tower site because of its central location and height. Unfortunately
      for the town cellular phone users Manzella street is located on the edge of town and at
      a lower elevation resulting in poor cellular reception at the town center. Mr. Manzella
      not only redirect income from the Rockland tax payers to his pocket but also deprived
      Rockland residents from quality cellular reception.

144.  Mr. Manzella was found guilty and fined by the Massachusetts ethic commissioned but
      the commission has no power to enforce a relocation of the cellular antenna and the
      rental income from the cellular phone companies is still being paid to Mr. Manzella
      instead of the town.

145.  Mr. Manzella Street named the street on which the antenna located as Manzella Street.
      The street is on private land but the street sign resembling a town street name designed
      to hide from passerby the fact that the antenna tower which is visible from the main
      road is standing Mr. Manzella's private land.

146.  After the house 100 100 Hartsuff Street was sold Mr. McGee, his wife and child moved
      into the first floor of 516 Union Street, a small two bedroom rental property which at
      the time belonged to the McGee's. That house was sitting on one acre of land across
      the street from the McGee car business at 511 Union street, the same street leading to
      the Naval Air Station Development site.

147.  During 2003 Mr. McGee was approached by a builder who attempted to develop
      495 Union Street.  Unknown to Mr. McGee at a time, 495 Union Street was approved
      by the Town of Rockland for a 6 residential houses. The builder told Mr. McGee that
      he was forced to abandoned the development since the Rockland Conservation
      Commission led by a Mr. Kenneth, Karlson and the Rockland Zoning Board of
      Appeals led by Mr. Manzella have changed most of the property land classification into
      wet land and reduced the number of buildable lots, first to two and then to one.  That
      decision was made even that no part of 495 Union Street land was hydraulically fed and
      the only visible water on the ground among the large trees on the property in mud after
      a strong rain. The developer who was forced to abandoned the project asked Mr.
      McGee if he would be interested to help the 495 land owner by buying the property.